# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>A business located on the second floor of the commercial building located at 30 South San Gabriel Boulevard, Pasadena, California 91107, described further in Attachment A-1 | )<br>)<br>)<br>)    Case No. 2:20-MJ-545<br>)<br>)<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Manuel Gonzales,
U.S. Department of Labor, Office of Inspector General
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Steve Kim
*Printed name and title*

AUSA:  Lauren Restrepo x3825

<u>**ATTACHMENT A-1**</u>

<u>PREMISES TO BE SEARCHED</u>

The second floor office space of the commercial building located 30 South San Gabriel Boulevard, Pasadena, California 91107 (the "**SUBJECT PREMISES**").  The commercial building has light brown brick on the front façade of the building and grey decorative signage reading, "décor" "globally inspired".  There is a store glass window between two brick columns with the number "30" on each column, which are clearly visible from the street.  The front door is glass with a rustic brown wood frame. A sign on the door instructs customers to enter through the side door of the building, which is accessible through an alleyway facing north.  The **SUBJECT PREMISES** is accessed via a stairway inside the rear portion of the building, next to the restroom.

The **SUBJECT PREMISES** to be searched includes (a) all rooms, porches, containers, storage spaces, and safes in the **SUBJECT PREMISES**; and (b) any digital devices found at the **SUBJECT PREMISES**.

i

**ATTACHMENT B**

**I.**   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1546 (Fraud and misuse of visas, permits, and other documents); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1341 (Mail fraud); and 18 U.S.C. § 1343 (Wire fraud) (the "Subject Offenses"), namely:

a.   Records, documents, checks, letters, invoices, promissory notes, correspondence, telephone facsimile records, faxes, applications, employment contracts, employment questionnaires, job offer letters, timesheets, or other documents relating to fraudulent H-1B visa petitions submitted by Smallboard.com, dba OneAxis ("Smallboard") for H-1B visa beneficiaries;

b.   Records, documents, and correspondence related to payroll issues or guidance for communicating with any governmental entity related to fraudulent H-1B visa petitions or fraudulent prospective H-1B visa petitions;

c.   Records, documents, and correspondence related to any investigation or inquiry by the USCIS or the DOL;

d.   Financial records, including bank statements, check registers, cancelled checks, deposit items, financial instruments, wire transfers, invoices, general ledgers, and receipt books related relating to fraudulent H-1B visa petitions submitted by Smallboard for H-1B visa beneficiaries;

e.    Documents, records, and contracts involving Smallboard and end-clients, including Engineer's Associates, Inc. and SAS Advisory Systems, related to fraudulent H-1B visa petitions;

f.    Names, phone numbers, addresses, work contracts, rosters, and job descriptions of employees of, or other personnel at, Smallboard; and

g.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

h.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in the warrants were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the attachment of other devices;

          iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing these search warrants will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrants. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

     f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

     g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

    7.   During the execution of these search warrants, with respect to any person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrants, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person (to include PAREEK) onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person (to include PAREEK) with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    8.   The special procedures relating to digital devices found in these warrants govern only the search of digital

devices pursuant to the authority conferred by these warrants
and do not apply to any search of digital devices pursuant to
any other court order.

## AFFIDAVIT

I, Manuel Gonzales, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for warrants to search the second floor office space of the commercial building located at 30 South San Gabriel Boulevard, Pasadena, California 91107, (the "**SUBJECT PREMISES**"), as described more fully in Attachment A-1, and the person of HARISH PAREEK ("PAREEK") as described more fully in Attachment A-2.

2.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1546 (Fraud and misuse of visas, permits, and other documents), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1341 (Mail fraud), and 18 U.S.C. § 1343 (Wire fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.   I am a Special Agent ("SA") with the U.S. Department of Labor ("DOL"), Office of Inspector General ("OIG"), Office of Investigations-Labor Racketeering and Fraud and have been so employed since May 2000.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.  I am currently working with the Document and Benefit Fraud Task Force ("DBFTF") in Los Angeles.  The DBFTF is comprised of federal agencies partnered to combat federal criminal fraud derived from documentation.  Partner agencies include; Homeland Security Investigations ("HSI"), Diplomatic Security Service ("DSS"), United States Citizenship Immigration Service ("USCIS") and the Department of Labor – Office of Inspector General ("DOL-OIG"). Among my other duties as a SA of the DOL-OIG, I investigate criminal violations relating to fraud, waste and abuse of various DOL programs.  During my tenure as a SA, I have participated in and led multiple investigations of criminal activity including labor racketeering, immigration fraud, unemployment insurance fraud, healthcare fraud, government contract fraud, and other related financial crimes. I have participated in the execution of multiple search and arrest warrants and have seized evidence of violations of federal law.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.   The DOL-OIG, Office of Investigations-Labor Racketeering and Fraud, is currently investigating PAREEK for engaging in a scheme to fraudulently obtain H-1B visas for various beneficiaries through his software service company

Smallboard.com, Inc. ("Smallboard"), whose California office is located in at the **SUBJECT PREMISES.**

6.     As set forth in detail below, H-1B visas are temporary employment visas for specialized occupations.  Since at least 2013, PAREEK has engaged in a scheme to fraudulently obtain H-1B visas for beneficiaries by falsely claiming to the DOL and USCIS that H-1B beneficiaries would be employed at Smallboard or at various end-clients of Smallboard, when, in fact, no such jobs or job opportunities existed.

7.     As part of his scheme, and in support of the fraudulent H-1B visa petitions, PAREEK submitted fraudulent contracts between Smallboard and end-clients, as well as fraudulent offers of employment for the H-1B visa beneficiaries from end-clients of Smallboard or Smallboard itself.  Smallboard is not a legitimate software business offering actual services to end-customers and has no need for the H-1B visa beneficiaries it purportedly employs.  Rather, PAREEK operated Smallboard as a job placement service.  Once the H-1B visa beneficiaries were in the United States on approved H-1B visas, PAREEK had the beneficiaries find their own employment or assisted them in finding employment.  Once employment was secured, PAREEK negotiated an hourly rate with the employer and PAREEK kept a percentage of that rate as a commission.  As part of the scheme, PAREEK also required H-1B beneficiaries to cover the cost of the visa petitions and legal fees, which is prohibited by the DOL. Furthermore, PAREEK did not pay visa beneficiaries during periods that they were in the United States on approved H-1B

visas but were not working or had not yet been placed at an end-
client, nor did he maintain day-to-day supervision of working
beneficiaries' work assignments, as required by the USCIS.

8.   A review of PAREEK's Yahoo email account, obtained
pursuant to a federal warrant, revealed communications by PAREEK
related to the scheme, including communications with a co-
conspirator -- Sanjiv Patel ("PATEL") -- who allowed PAREEK to
fraudulently list PATEL's business's name (Engineer's
Associates) and address as an end-client on forms submitted to
the government in support of several H-1B visa petitions.

9.   During an interview with agents on or about November
9, 2019, PATEL confirmed that he was aware that PAREEK had
petitioned foreign workers to work for Engineer's Associates but
that none of those foreign workers ever actually worked for
Engineer's Associates.

10.  The investigation further revealed that Jessica West
("West") is the Human Resource Manager at Smallboard.  In an
interview with law enforcement in December 2019, West confirmed
that she has worked for Smallboard for approximately seven years
and that she works remotely from her home in Waddell, Arizona.
West confirmed that her assistant, B. Alsina, works out of the
**SUBJECT PREMISES**, which is located on the second floor of the
building.  West also informed agents that the hard copy files
relating to the H-1B beneficiaries were at the **SUBJECT PREMISES**
stored in boxes and file cabinets.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, my own training
and experience with visa fraud investigations, as well as my own
knowledge of, and participation in, this investigation, I am
aware of the following:

**A.    Background on H-1B Visa Applications**

12.   The H-1B visa program applies to U.S. employers
seeking to hire non-immigrant aliens as workers in specialty
occupations in the United States.  A specialty occupation is one
that requires the application of a body of highly specialized
knowledge and the attainment of at least a bachelor's degree or
its equivalent.  The intent of the H-1B visa provisions is to
help U.S. employers who cannot otherwise obtain needed business
skills and abilities from the U.S. workforce by authorizing the
temporary employment of qualified non-immigrant aliens who are
not otherwise authorized to work in the United States.

13.   To obtain legal status for a prospective non-immigrant
alien, an employer can file a non-immigrant petition seeking a
temporary employment visa for the alien (i.e., an H-1B visa) or
can file an immigrant petition seeking permanent status for the
non-immigrant worker (also known as a "Green Card").  Either
petition is to be filed with the USCIS, formerly the U.S.
Immigration and Naturalization Service ("INS").  The requesting
company is referred to as the "petitioner," and the non-
immigrant alien is referred to as the "beneficiary."

14.  A petitioner seeking to employ a non-immigrant alien temporarily in a professional or specialty occupation is first required to file a Form ETA-9035, Labor Condition Application ("LCA") with the DOL before USCIS may approve an H-1B visa for temporary employment.  In the application to the DOL, the petitioner, under penalty of perjury, must submit information about the prospective employment such as the nature of the open position, the rate of pay, the period of employment, and the location where the beneficiary will conduct their work.

15.  If the DOL approves the LCA, the petitioner must then file with USCIS a copy of the LCA and a "Petition for Non-Immigrant Worker" (Form I-129) along with supporting documentation.  In order to establish the required "employer-employee relationship" with the beneficiary required by 8 C.F.R. 214.2(h)(4)(ii), USCIS requires that a "bona fide" offer of employment be made to a prospective alien beneficiary before an H-1B visa may be approved.  In addition, the petitioner must be able to establish that it has the "right to control" how the work is performed and must maintain day-to-day supervision of the beneficiary's work assignments.  In the I-129 petition, the petitioner must submit, under penalty of perjury, information about the prospective employment, including the job title, physical location of the job, wages or salary, benefits, and the availability of the position.  The petitioner must also submit documents showing that the non-immigrant alien is qualified for the specialty job position.

16.   The I-129 H-1B visa petition also requires the petitioner to sign and "certify, under penalty of perjury that this petition and the evidence submitted with it is all true and correct to the best of my knowledge."  In the accompanying instructions for I-129 petition, the petitioner is advised that "[b]y signing this form, you have stated under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form is true and correct."  The instructions also add that "[i]f you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-129, we will deny your Form I-129 and any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution."  If an I-129 is not signed, it will be rejected.

17.   When applying for an H-1B visa, petitioners often wish to place the non-immigrant alien beneficiary at a third-party worksite, also known as an "end-client," to work as a contractor on a specific project for an end-client company.  As a common practice, petitioners provide supporting documentation to provide proof of the work opportunity at the end-client company, such as a "Statement of Work."  A Statement of Work is typically prepared by the end-client company stating the need for a specific non-immigrant alien worker.  The statement of work typically provides the alien's name, start date, scope of responsibilities, and how long the alien's services will be required.  This document is signed by representatives of the petitioning employer and the end-client company.  Supporting

7

documentation may also include employment offers between the petitioner and the H-1B beneficiary, the H-1B beneficiary's university transcripts, resume, and paystubs from previous employers.

18.  Although supporting documentation is not required in the H-1B visa process, its absence may trigger USCIS to issue a request for evidence ("RFE"), which can delay the adjudication process.  RFEs occur when USCIS is unable to determine eligibility based on the evidence provided.  In order to avoid delays in processing, most petitioners will submit as much supporting documentation as possible along with the H-1B visa petition.

19.  If USCIS approves the I-129 H-1B visa petition, and the beneficiary is outside of the United States, the beneficiary must attend an interview at a U.S. Consulate Office with a Consular Officer to determine if the beneficiary is qualified to receive the visa.  If no problems are found, an H-1B visa is issued to the alien by the U.S. Department of State for a period of up to three years.

20.  However, if while reviewing the petition for an H-1B visa, USCIS determines that the beneficiary does not have a bona fide job opportunity awaiting him or her, the petition must be denied.  Historically, USCIS has not granted H-1B classification on the basis of speculative, or undetermined, prospective employment.  The H-1B classification is not intended as a vehicle for an alien to engage in a job search within the United States, or for employers to bring in temporary foreign workers

8

to meet possible workforce needs arising from potential business expansions or the expectation of potential new customers or contracts.

21.  The law also establishes certain standards in order to protect similarly employed U.S. workers from being adversely affected by the employment of the non-immigrant alien, as well as to protect the H-1B non-immigrant aliens themselves.  For example, U.S. employers must attest to the DOL that they will pay wages to the H-1B non-immigrant aliens that are at least equal to the actual wage paid by the employer to other U.S. workers with similar experience and qualifications for the job in question, or the prevailing wage for the occupation in the area of intended employment -- whichever is greater.

22.  Additionally, the DOL requires that petitioners pay their H-1B visa beneficiaries during nonproductive work time. These periods of unemployment are also known as "benching."  H-1B non-immigrant workers must be paid the required wage rate for all nonproductive -- or "benched" -- time caused by conditions related to employment, such as lack of assigned work, lack of a permit, or studying for a licensing exam.  No payment, however, is required under the H-1B program for nonproductive time due to reasons not related to employment, such as a worker's voluntary absence from work or a hospitalization, etc.  Employers, however, remain obligated to comply with the Immigration and Nationality Act or any other statute relating to employment (such as the Family and Medical Leave Act).  Nonproductive time

9

must be paid at the required wage rate for the occupation listed on the H-1B worker's LCA.

23.   The DOL's Wage and Hour Division also prohibits employers from requiring H-1B non-immigrant workers to pay any part of the statutory training and processing fee imposed by USCIS, any part of the fraud protection and detection fee, and any business expenses that would reduce the H-1B worker's pay below the required wage, including attorney fees related the H-1B visa application process.

24.   USCIS must also enforce a congressionally mandated cap on the number H-1B visas it approves.  If USCIS receives more petitions than the cap established for any given year, then it must use a computer-generated random selection process to select H-1B visa petitions.  This is commonly referred to as the "lottery."  If a petition is not picked in the lottery, then the application package is not reviewed and is sent back to the petitioner, who can reapply.

**B.   Background on H-1B Visa Fraud Schemes**

25.   Based on my training and experience, I know that employment-based H-1B visa fraud schemes to fraudulently obtain H-1B visa often follow recognizable patterns, including:

a.   Petitioners will commonly invent end-client companies that the visa beneficiaries purportedly will work at when they arrive in the United States.  In such cases, the purported end-client company is simply a shell company, or is non-existent.

10

b.    In some cases, petitioners will submit fraudulent materials in support of the petitions, including letters and contracts from the fake end-clients falsely claiming that the employer has a bona fide employment opportunity for the beneficiary.

c.    Then, months after the petition is approved and the beneficiary is in the United States, petitioners either find the now out-of-status non-immigrant beneficiary a job at another end-client location or the non-immigrant beneficiary finds work on their own.  Other times, the beneficiary remains unemployed and on the "bench."

d.    In some cases, petitioners will falsely claim that they maintain the "right to control" the work of the beneficiary, supervise their daily activities, and evaluate their performance, when in fact they have no control over the beneficiary's work assignments, play no supervisory role, and do not evaluate the beneficiary's job performance.

e.    To conceal the scheme, petitioners may coach the H-1B visa beneficiaries about how to answer questions if they are approached by representatives of federal agencies such as USCIS, the DOL, or the U.S. Department of State regarding their employment.

26.  False or misleading statements in an H-1B visa petition regarding the existence of an employer or job that does not, in fact, exist are material to the determination by the DOL and USCIS of whether to grant or approve a petition.  Moreover, the discovery of such false or misleading statements in a

previously approved petition (or in supporting documentation) may constitute grounds for revocation or denial of that prior visa approval.

### C.   DOL's Investigation of PAREEK and Smallboard

27.   Smallboard, also operating under the name One Axis, purports on their website to be a software service company with offices in Pasadena, California (the **SUBJECT PREMISES**) and Plano, Texas.  PAREEK founded Smallboard in approximately 1999.

28.   Based on my review of H-1B visa petitions submitted to USCIS, I know that Smallboard has filed approximately 143 H-1B visa petitions with USCIS.  The majority of those petitions (approximately 114) were filed in the last five years.

### 1.   May 2018 Complaint to DOL

29.   On or about May 17, 2018, the DOL Wage and Hour Division forwarded to DOL-OIG a written complaint from F.M. that alleged various H-1B visa violations by Smallboard and PAREEK. In the written complaint, F.M. stated that the complaint was based on information s/he received from a former employee of Smallboard who was also a close relative of PAREEK.  The complaint alleged that Smallboard submitted false information to the DOL and USCIS in support of H-1B visa applications.  The complaint also stated that PAREEK required beneficiaries to pay their H-1B visa fees, "benched" H-1B employees, and sometimes required "benched" employees to return payroll money.  In addition, the complaint stated that many of the H-1B beneficiaries sponsored by PAREEK were unqualified and their resumes were fabricated.

12

30.   On or about June 5, 2018, DOL-OIG SA Roger Passero, Homeland Security Investigations SA Carmen Jacobsen, and DOL OIG SA Cristina Jones interviewed F.M. and learned that s/he wrote the complaint on behalf of a friend and former Smallboard employee, V.V.   F.M. stated that at the time the complaint was written, V.V. was still employed through Smallboard at an end-client (specifically, Southern California Edison) and did not write the complaint because s/he wanted to remain anonymous.

31.   However, by the time of F.M.'s June 5, 2018 interview, V.V. had been terminated from Southern California Edison and was willing to be interviewed as part of the investigation.

2.   Fraudulent H-1B Beneficiary #1: V.V.[1]

32.   On or about June 8, 2018, DOL-OIG SA Marcus Valle and SA Jones interviewed V.V. who stated, in relevant part:

a.   V.V.'s first cousin is married to PAREEK.   In late 2014, V.V. lived with PAREEK for approximately two months while PAREEK petitioned for V.V.'s H-1B visa through PAREEK's company Smallboard.   The visa application was successful and V.V. received an H-1B visa in approximately February 2015.

b.   V.V. stated that PAREEK withheld money owed to V.V. as a form of repayment for V.V.'s H-1B visa petition fees and that PAREEK also required other H-1B beneficiaries to pay the approximately $4,000 in H-1B visa petition fees related to

---

[1] At the time of V.V.'s interview on June 8, 2018, V.V. stated s/he had not spoken to PAREEK since January 2018.   V.V. said that s/he and PAREEK had a falling out after V.V. asked PAREEK for a raise and PAREEK refused.   V.V. also believed that PAREEK had kept a portion of V.V.'s hourly wage, even though PAREEK had denied doing so.

their applications.  V.V. said s/he assisted PAREEK in collecting money from some of Smallboard's other H-1B visa beneficiaries.

     c.   V.V. also stated that the supporting documentation for V.V.'s H-1B visa application included a fake letter from an end-client company named Engineer's Associates, Inc. ("Engineer's Associates") located in Northern California. According to V.V., the letter stated that V.V. would be working at Engineer's Associates, even though V.V. never intended to work there.

     d.   V.V. stated that s/he never worked at Smallboard or Engineer's Associates and instead was placed at Southern California Edison after her/his H-1B visa petition was approved. V.V. worked at Southern California Edison until s/he was terminated on May 11, 2018.  According to V.V., PAREEK's friend, PATEL, is the owner of Engineer's Associates and allowed PAREEK to use the name of the company, and PATEL's signature, on fake end-client letters.  V.V. stated that s/he believed PAREEK used fake end-client letters from Engineer's Associates to support approximately three or four H-1B visa applications.

     e.   V.V. said that Smallboard's office is located in Pasadena, California but that no employees actually work at that location.  Rather, the location is a furniture store named "Décor," owned by PAREEK's wife, Deepali Pareek.  V.V. said that Smallboard also has an office in Texas, which V.V. understood was opened because Texas has a lower prevailing wage than

California.  V.V. said that, like the Pasadena office, no
employees actually worked out of Smallboard's Texas office.

      f.   V.V. stated s/he knew approximately five or six
Smallboard H-1B beneficiaries who had no employment when they
arrived in the United States.  As a result, those beneficiaries
received no pay and were "benched" -- some for several months.
In order to keep up the fraud scheme, V.V. said that PAREEK
would sometimes process payroll for the benched beneficiaries so
that it appeared as if the beneficiaries were working, but
required those beneficiaries to return the money.

    33.  In December 2018, Southern California Edison provided
DOL agents a list of current and former employees that were
retained through Smallboard and/or One Axis.  The list confirmed
that V.V. worked at Southern California Edison, through
Smallboard, from March 10, 2015 to December 31, 2017.

    34.  A review by SA Jones of V.V.'s H-1B visa petition and
supporting documentation revealed the following:

      a.   On February 9, 2015, PAREEK signed, under penalty
of perjury, a Form I-129 Petition for a Nonimmigrant Worker
application for V.V.  Smallboard was listed as the petitioner
and V.V. as the beneficiary.  The dates of intended employment
were February 15, 2015 through August 28, 2016.

      b.   Attached in the supporting documentation for
V.V.'s I-129 petition was a letter of support, dated February
13, 2015, from PAREEK on behalf of Smallboard which stated that
V.V. would be employed as a "SAP ERP FI Process Analyst" at the

**SUBJECT PREMISES**, and additionally would work three times per month at end-client Engineer's Associates in Newark, California.

c.   Also attached in the supporting documentation for V.V.'s I-129 petition was a letter dated February 8, 2015, on letterhead from Engineer's Associates, signed by PATEL, which stated that Engineer's Associates engaged the services of Smallboard and that V.V. would be employed as a "SAP ERP FI Process Analyst" performing work for Engineer's Associates.  The letter stated that V.V. would be working on a project expected to be completed no earlier than August 2017.

d.   The records indicated that V.V.'s H-1B visa was approved on March 3, 2015.

3.   Fraudulent H-1B Beneficiary #2: T.C.

35.   On or about September 13, 2018, SA Jones and U.S. Department of State ("DOS"), Diplomatic Security Service ("DSS") SA Luis Orozco interviewed T.C., a visa beneficiary who had previously received an H-1B visa through Smallboard.  In addition, SA Jones also spoke to T.C. again via telephone on June 6, 2019.  During the interview and follow-up telephone conversation, T.C. stated the following, in relevant part:

a.   T.C. began working for Smallboard in December 2013.  PAREEK, through Smallboard, petitioned for and obtained an H-1B visa for T.C.  T.C. confirmed that the petition was filed in approximately April 2013.  T.C. said that s/he paid PAREEK approximately $4,000 to $5,000 for attorney fees and visa application fees related to the H-1B visa application.

b.     T.C. said s/he was previously employed at Tata Consulting Services on an L-1B[2] visa.  T.C. stated that in early 2013 s/he was looking for a new job and submitted an application to Smallboard online.  When s/he applied, T.C.'s understanding was that Smallboard would apply for an H-1B visa on T.C.'s behalf and find T.C. a job based on T.C.'s qualifications.  T.C. left Tata Consulting Services on November 22, 2013, and began working for Smallboard on approximately December 2, 2013.  T.C. stated that s/he found a job her/himself with a company named Accelerant and notified Smallboard about the job.  T.C. recalled that the person at Smallboard s/he notified was possibly Jessica West.  According to T.C., PAREEK then worked out an hourly rate with Accelerant for T.C.'s services, since T.C.'s H-1B visa was approved for employment at Smallboard, not Accelerant.  T.C. stated that s/he worked at Accelerant but was paid through Smallboard.  In 2014, T.C. transferred her/his H-1B visa from Smallboard to Accelerant.

c.     T.C. said that s/he never went to Smallboard's office in Pasadena and that s/he had never heard of Engineer's Associates, never worked for Engineer's Associates, and never intended to work for Engineer's Associates.  T.C. also stated that T.C. had never met or heard of Engineer's Associates' owner PATEL.  In addition, T.C. stated that s/he never heard of SAS Advisory Systems, had never worked there, and never intended to

---

[2] An L-1B visa is a non-immigrant visa issued to foreign employees with specialized knowledge transferring from their company's foreign office to the company's office in the United States.

work there.  T.C. said that her/his only job through Smallboard was at Accelerant.

36.  After the interview, T.C. provided pay stubs from Smallboard.  The first pay stub was for the pay period December 1, 2013 through December 31, 2013.  T.C.'s final pay stub was for the pay period March 1, 2014 through March 31, 2014. The paystubs were from Smallboard and made no reference to Accelerant.

37.  T.C. also provided two invoices from the Law Offices of Nadadur S. Kumar.  The first invoice, dated March 20, 2013, was for $2,000 and indicated it was for attorney's fees for H-1B visa processing.  The second invoice, also dated March 20, 2013, was for $250 and indicated it was for academic credential evaluation fees.  T.C. confirmed that T.C. paid both of these fees.  T.C. noted that s/he thought s/he paid the fees via check but could not locate copies of the checks because they were over five years old.

38.  On September 13, 2018, Accelerant confirmed via email that T.C. worked at Accelerant, through Smallboard, from December 16, 2013 through March 21, 2014.

39.  A review by SA Jones of T.C.'s H-1B visa petition and supporting documentation revealed the following:

a.  On March 26, 2013, PAREEK signed, under penalty of perjury, a Form I-129 Petition for a Nonimmigrant Worker application for T.C.  Smallboard was listed as the petitioner and T.C. as the beneficiary.  The dates of intended employment

with Smallboard were from October 1, 2013 through September 14, 2016.

      b.    Attached in the supporting documentation for T.C.'s I-129 H-1B visa petition was a letter of support from PAREEK on behalf of Smallboard, dated March 29, 2013, which stated that T.C. would be employed as a Software Developer at Smallboard's office in Pasadena, California.  In addition, contracts with Engineer's Associates and SAS Advisory Systems were included in the supporting documentation as examples of Smallboard's clients and the type of work the beneficiary would be assigned.

      c.    The records indicated that T.C.'s H-1B visa petition was approved on October 25, 2013.

    4.   <u>Fraudulent H-1B Beneficiary #3: K.H.</u>

40. On or about October 28, 2019, DOS-DSS SA Luis Orozco and I interviewed K.H., a visa beneficiary who had previously received an H-1B visa through Smallboard, at K.H.'s current place of employment in Collierville, Tennessee.  During the interview, K.H. stated the following, in relevant part:

      a.    K.H. first heard of Smallboard from a friend in India and K.H.'s first contact with Smallboard employees was with West and PAREEK.  K.H. stated that s/he was hired by Smallboard to be a software developer and was hired to design the development of architecture, data modules using java-based applications.  K.H. stated that s/he was hired to work at Smallboard and work with a Smallboard client, the name of which s/he could not recall.  K.H. also stated that s/he was hired to

work for Smallboard at Smallboard's office in Pasadena, California.  K.H. said s/he was hired at the rate of $75,000 per year.

b.   Upon arrival in the U.S. on or about January 17, 2017, K.H. traveled to the Smallboard office in Pasadena, California and met with PAREEK.  K.H. stated that when s/he first saw Smallboard's office s/he was very disappointed and thought it was very small.  K.H. said that s/he only went to Smallboard's office one time.

c.   K.H. also stated that s/he was only in Los Angeles for approximately 4-5 days, and then he went to see a friend in Fremont, California and stayed with that friend for approximately two weeks.  K.H. stated that while s/he was in Fremont, s/he was working for Smallboard on his/her laptop doing data modeling and architecture design.  K.H. stated that s/he was not supervised by anyone from Smallboard or any other company during the time s/he was in Fremont.

d.   While in Fremont, K.H. was told by PAREEK that s/he must continue to be available for job interviews.  K.H. also stated that s/he traveled to Dallas, Texas for job interviews and went through three separate interviews in Dallas with three different companies.

e.   Upon questioning, K.H. agreed that s/he was "benched" between approximately January 17, 2017 and February 20, 2017, as s/he was not really working on anything and had to do interviews with companies for different jobs.  When asked if

s/he received any compensation from Smallboard during this period, K.H. stated s/he was never paid for that time.

      f.   K.H. also stated s/he never worked for a company called Engineer's Associates and never traveled to Newark, California to work for Engineer's Associates on behalf of Smallboard.

    41. A review of K.H.'s H-1B visa petition and the supporting documentation revealed the following:

      a.   On August 30, 2014, PAREEK signed, under penalty of perjury, a Form I-129 Petition for a Nonimmigrant Worker application for K.H.  Smallboard was listed as the petitioner and K.H. as the beneficiary.  The dates of intended employment were from August 12, 2014 to August 11, 2017.

      b.   Attached in the supporting documentation for K.H.'s I-129 H-1B visa petition was a letter of support from PAREEK on behalf of Smallboard, dated September 11, 2014, which stated that K.H. would be employed as a Software Developer at the **SUBJECT PREMISES** and at its end-client's office located in Newark, California.  In addition, a contract between Smallboard, Inc. and Engineer's Associates was included in the supporting documentation.

      c.   USCIS records indicate that K.H.'s H-1B visa petition was approved on December 9, 2015.

    5.   <u>Additional Smallboard H-1B Visa Petitions</u>

    42. On or about January 15, 2019, DOL-OIG SA Jones and DOS-DSS SA Orozco received a spreadsheet from USCIS indicating that Smallboard has filed approximately 143 H-1B visa petitions

since 1999.  A majority of those petitions (approximately 114) were filed in the last five years.  At least 97 of the H-1B visa petitions filed by Smallboard were approved by USCIS.

43.  On or about January 15, 2019, SA Jones and SA Orozco reviewed 71 H-1B visa petitions and their supporting documentation filed by Smallboard between 2013 and 2018 and learned the following:

     a.  Fifty-seven of the visa petitions reviewed were signed, under penalty of perjury, by PAREEK.

     b.  Thirty-seven of the visa petitions listed the place of employment for the H-1B visa beneficiaries as the **SUBJECT PREMISES**.

    **D.**    **Site-Visits and Surveillance of Smallboard**

      1.  <u>March 26, 2018 USCIS Site Visit to Smallboard</u>

44.  On or about July 19, 2018, SA Jones and SA Orozco received a Fraud Detection and National Security[3] ("FDNS") site visit worksheet from USCIS regarding a visit to the **SUBJECT PREMISES** on March 26, 2018.  The site visit was conducted to inquire about a beneficiary named N.D., whose H-1B visa petition had been approved by USCIS on September 23, 2016.

45.  SA Jones searched a Department of State database and saw that on July 21, 2017, N.D. was refused a visa to enter the United States by the U.S. Department of State.  A referral was sent to the U.S. Department of State Fraud Prevention Unit

---

[3] FDNS is a branch of USCIS.  Their goal is to detect fraud in the legal immigration application process.  FDNS verifies information provided on, an in support of, applications and petitions.  One verification method used by FDNS is performing site visits.

("FPU") to verify employment due to concerns that the employee would be "benched."  On February 28, 2018, FPU requested that FDNS conduct a site visit.

46.  The report from the March 26, 2018 FDNS site visit stated the following:

a.  An unannounced site visit was conducted by two USCIS Immigration Officers ("IOs") on March 26, 2018 at the **SUBJECT PREMISES**.  The report noted that a business name "Décor" appeared to be located at that address.  When the IOs arrived, the Décor office manager informed the IOs that Smallboard's office was located on the second floor.  The IOs went to the second floor and identified one employee named "Maria," who told the IOs she was the Human Resources Assistant.  She stated that she had been working for Smallboard since October 2017 and that Smallboard had four full-time employees, including herself.  She stated the other three employees were a supervisor named "Jessica" and two "consultants."  She said the two consultants worked four to five days per week.

b.  During the visit, the IOs observed that Smallboard's working space could only accommodate a maximum of six employees.

c.  During the visit, the IOs also spoke to PAREEK over the telephone and he informed them that he was at a business meeting but could meet the IOs at the **SUBJECT PREMISES** in approximately 45 minutes.

d.  After speaking with PAREEK, the IOs left Smallboard and returned a short time later.  When they returned

PAREEK was present and an interview was conducted.  PAREEK stated that Smallboard had operated at that location since 2012, employed about 30-35 people, and that seven employees worked at the **SUBJECT PREMISES** and approximately 15 employees worked for end-clients.

> e.    When asked about H-1B visa beneficiary N.D., PAREEK stated that N.D. would be working in the software section of Smallboard's Pasadena location on a project for an end-client, however PAREEK did not know the exact title of N.D.'s position at the end-client.

> f.    PAREEK initially told the IOs that the furniture store Décor was not associated with Smallboard but when asked a second time admitted that Décor was owned by his wife.

> g.    During the IO's site visit, two adult males entered the workspace and turned on their laptops.  The two adult males were identified as Raghavendra Nahendra and Sandeep Urumkar.  Nahendra told the IOs that he had been working for Smallboard as a software engineer under an H-1B visa since May 2016.  Urumkar stated that he had been working for Smallboard as a senior systems analyst under an H-1B visa since June 2017.

47.  The FDNS report noted that fraud was highly suspected by the OIs based on their visit due to the two employees coincidentally arriving for work while the IOs were at the **SUBJECT PREMISES**, and because the IOs were unable to determine if N.D. would actually be working for Smallboard.

48.  A review by SA Jones of N.D.'s H-1B visa petition and supporting documentation revealed the following:

a.   On March 28, 2016, PAREEK signed, under penalty of perjury, a Form I-129 Petition for a Nonimmigrant Worker application for N.D.  Smallboard was listed as the petitioner and N.D. as the beneficiary.  The dates of intended employment were from October 1, 2016 to August 31, 2019.

b.   Attached in the supporting documentation for N.D.'s I-129 H-1B visa petition was a letter of support from PAREEK on behalf of Smallboard, dated March 31, 2016, which stated that N.D. would be employed as a Software Engineer at the **SUBJECT PREMISES**.

2.   November 15, 2018 USCIS Site Visit to Smallboard

49.   On or about January 31, 2019, SA Jones and SA Orozco reviewed a second FDNS site visit report from USCIS regarding a visit to Smallboard on November 15, 2018, regarding H-1B beneficiary R.P.  R.P. had an approved H-1B visa through Smallboard from December 30, 2015 through May 19, 2018.  USCIS received an extension of stay H-1B petition for R.P. on May 15, 2018.

50.   The FDNS report stated that an IO visited the **SUBJECT PREMISES** on November 15, 2018.  When he arrived, the IO was informed by PAREEK's wife that PAREEK was out in the field.

51.   PAREEK's wife called PAREEK and informed him of the IO's presence.  PAREEK stated that he would be back in ten minutes.  When PAREEK arrived, he told the IO that R.P. had previously worked at Southern California Edison for six to seven months but PAREEK could not articulate why R.P. no longer worked at Southern California Edison.  PAREEK also stated that R.P.

currently worked for Smallboard and was working from home on
internal house projects and assignments as well as internal
stuff.  During the interview PAREEK could not articulate how
much R.P. earned and referred the IO to his Human Resources
Manager, Jessica West.

52.   The IO's report noted that Smallboard did not appear
to be an IT company engaged in the designing and development of
IT and engineering solutions, as stated in the visa petition for
R.P.

53.   A review by SA Jones of R.P.'s H-1B visa petition and
supporting documentation revealed the following:

a.   On April 22, 2018, PAREEK signed, under penalty
of perjury, a Form I-129 Petition for a Nonimmigrant Worker
application for R.P.  The application was an amended petition
requesting an extended stay from a previously approved petition.
Smallboard was listed as the petitioner and R.P. as the
beneficiary.  The dates of intended employment were from May 20,
2018 to November 9, 2020.

b.   Attached in the supporting documentation for
R.P.'s I-129 H-1B visa petition was a letter of support from
PAREEK on behalf of Smallboard, dated April 26, 2018, which
stated that the purpose of the petition was to amend R.P.'s
worksite location and to employ the R.P. as a "Business Analyst"
at Southern California Edison.

3.   Surveillance at Smallboard's Office

54.   On January 15, 2019, SA Jones and SA Orozco reviewed
visa petitions submitted by Smallboard which revealed that

26

Smallboard had at least eight valid H-1B visas for beneficiaries that should have been working at the **SUBJECT PREMISES** in January, February, and March 2019.

55.   On January 4, 2019, from approximately 8:08 a.m. to 10:30 a.m., I conducted surveillance at the **SUBJECT PREMISES**. During that time I saw that the business located at the address had a sign outside that read "Décor" and appeared to be a furniture store.  I also observed four vehicles arrive at the location between 9:00 a.m. and 10:30 a.m.  Records checks on the registered owners of the vehicles revealed that one vehicle was registered to PAREEK and his wife, one vehicle returned no record, and the registered owners of the remaining two vehicles did not match any of the eight beneficiaries that were supposedly working out of Smallboard at the time or any of the 114 H-1B beneficiaries petitioned by Smallboard in the last five years.

56.   The next month, on February 28, 2019, from approximately 8:27 a.m. to 11:57 a.m., I again conducted surveillance at the **SUBJECT PREMISES**.  At that time I observed five vehicles arrive at the location between 8:54 a.m. and 11:05 a.m.  I observed the vehicle registered to PAREEK and his wife arrive at approximately 9:53 a.m. and saw a female exit the vehicle and enter the building.  Records checks on the registered owners of the remaining four vehicles did not match any of the eight beneficiaries that were supposedly working out of Smallboard at that time or any of the 114 H-1B beneficiaries petitioned by Smallboard in the last five years.

57.  On March 6, 2019, from approximately 7:30 a.m. to 2:00
p.m., I again conducted surveillance at the **SUBJECT PREMISES**.  I
observed five vehicles at the Smallboard office and conducted
record checks on the plates that I observed.  Records checks on
the registered owners of the five vehicles did not match any of
the 9 beneficiaries that were supposedly working out of
Smallboard at the time or any of the 114 H-1B beneficiaries
petitioned by Smallboard in the last five years.

   **E.   Review of PAREEK's Emails and Interviews of PATEL and
        West**

        1.   Review of Emails from PAREEK's Yahoo Email
             Account

58. On or about July 18, 2019, I received and reviewed
records obtained pursuant to a federal search warrant for files
associated with PAREEK'S Yahoo email account
(hpareek@yahoo.com).  See In the Matter of the Search of:
Information associated with account identified as
hpareek@yahoo.com that is within the possession, custody, or
control of OATH HOLDINGS, INC., Case No. 2:19-MJ-02696 (C.D.
Cal. July 18, 2019).

59. A review of PAREEK'S Yahoo email account revealed
communications by PAREEK related to the scheme, including
communications with PATEL relating to PATEL allowing PAREEK to
fraudulently list PATEL'S business's name and address
("Engineer's Associates") as an end-client on forms submitted to
the government in support of several H-1B visa petitions.

60. Specifically, in an email dated March 7, 2015, from PATEL (using email address "sanjiv@petronational.com"[4]) to PAREEK, PATEL informed PAREEK that he was concerned that PAREEK was using his company's name to sponsor more H-1B beneficiaries than was originally agreed to and that PATEL allowed this as a "favor" thinking it would be a "onetime deal with a small number of people." In the email, PATEL further stated that he "talked to an immigration attorney here about the risk and she explained that they have filed criminal charges for the employers who have provided false documentation. That puts me and EAI into unnecessary risk of doing task that is not legal."

61. In a follow-up email dated June 9, 2016, PATEL emailed PAREEK with additional information including the following statement, in relevant part:

a. "Just recently when I was talking to the immigration attorney about Archit and Engineers Associates, Inc. She shared the list and I was shocked to see that there were 36 cases that were approved by SmallBoard using Engineer's Associates, Inc. Newark address in 2014 with total payroll in excess of $2.5M. Based on that number, looks like total number

---

[4] An internet search conducted on or about January 21, 2020, for "sanjiv@petronational.com" revealed that this email address is used by PATEL in relation to a company called National Petroleum, located at 39899 Balentine Drive, Suite 370, Newark, California 94650. National Petroleum's website lists PATEL as its Founder and CEO.

of applications done by SmallBoard must be way higher. When we agreed that you would use EAI for the H-1, I was thinking as a favor and that you would apply for few (may be 2-3) H1B visas. I never thought you would go and apply these many. You never asked me that you were going for those many visas. Anyway, at this high number it is no longer a favor to a friend but it became a business transaction between two companies. A business transaction between two companies where one get all the benefits and other gets nothing for taking the risk. It is only fair that my company also gets a portion of the benefit that your company is getting."

### 2. November 4, 2019 Interview of PATEL

62. On or about November 4, 2019, DOS-DSS SA Luis Orozco and I interviewed PATEL at his place of employment in Newark, California.  During the interview, PATEL stated the following, in relevant part:

a.    PATEL confirmed he is the CEO and owner of Engineer's Associates.  PATEL explained that he owns several gas stations, convenience stores, and real estate gas stations. According to PATEL, National Petroleum is the "doing business as" name for Engineer's Associates.  He said he has known PAREEK for more than 20 years and that PAREEK invested $50,000 in his first gas station.  PATEL stated that Engineer's Associates has several associated LLCs including New Era Energy LLC, Next Petroleum LLC, Hydro Carbon LLC.  The LLCs are the companies

that own the real estate in which the gas stations are located. The majority of their current business is selling wholesale gasoline to gas stations.

   b. PATEL stated that he contracted with Smallboard to design a software program to make his petroleum business more efficient. He said he hasn't worked with Smallboard for about five or six years. PATEL also stated that the software program contract with Smallboard was not successful.

   c. PATEL stated that PAREEK brought someone to his office to work for a couple of days here and there but that no one from Smallboard ever came to work at Engineer's Associates without PAREEK.

   d. PATEL stated that he understood that bringing foreign workers from India to work in the United States was part of PAREEK's business. During the interview, PATEL initially stated he did not know PAREEK was bringing in foreign workers from India to work at Engineer's Associates. However, when questioned further by agents, PATEL admitted he was aware that PAREEK had petitioned foreign workers to work for Engineer's Associates.

   e. PATEL acknowledged that he allowed PAREEK to petition one foreign worker to work at Engineer's Associates. However, according to PATEL, that worker never worked for Engineer's Associates. PATEL stated that he helped PAREEK because PAREEK told him it would be easier for Smallboard to get the petitions approved because of Engineer's Associates' high sales volume. PATEL stated that once he found out that PAREEK

31

petitioned more people under his company's name, he told PAREEK
to stop using Engineer's Associates for the petitions.

       f.   PATEL stated he did not make any money from this
arrangement.

      3.   <u>December 16, 2019 Interview of West</u>

63. On December 16, 2019, DOS-DSS SA Orozco and I
interviewed Jessica West at her residence in Waddell, Arizona.
During the interview she stated the following, in relevant part:

       a.   She has worked for Smallboard for approximately
seven years and was hired by PAREEK. West currently works
remotely for Smallboard from her home and is paid $60,000 per
year.  West stated that her direct supervisor is Amit Ajarwal
who works from his home in San Diego, and she said that there is
also one assistant, B. Alsina, who works out of the **SUBJECT
PREMISES** assisting with administrative duties.  According to
West, the Smallboard's office (the **SUBJECT PREMISES**) is located
on the second floor of the building while the first floor is
occupied by a furniture store called, "Décor" which is owned by
PAREEK's wife, Deepali Pareek.  West said the three of them,
Ajarwal, Alsina, and herself, run the daily operations of the
company and that PAREEK has not been involved in the daily
operations of the company since February 2019.  According to
West, Smallboard currently has 27 employees, 14 of which are H-
1B visa beneficiaries.

       b.   West stated that Smallboard is an IT consulting
firm that contracts their employees out to their clients.
According to West, Smallboard does not supervise the work of

their H-1B visa beneficiaries since that work is directed by Smallboard's clients.

c.   West stated she only learned this year that PAREEK had used Engineer's Associates as an end-client for H-1B petitions.  She noted that she saw it on paperwork she was scanning at the request of PAREEK, who had wanted hard copies of Smallboard's H-1B visa documents to be digitized.  She said she saw Engineer's Associates' information on some of the employee files she scanned.  West also noted that the hard copy files were at the **SUBJECT PREMISES** stored in boxes and file cabinets and that the digital copies are on her hard drive, which she keeps with her at her home office.

d.   West stated she understood the term "benched" to be when a consultant is not working on a project with the client.  She stated that some of the H-1B visa beneficiaries were "benched" when they were working out of the **SUBJECT PREMISES**.  She said she did not know how often an H-1B visa beneficiary from India would come and be "benched" upon arrival. She stated that most H-1B visa workers would be immediately placed at an end-client upon arrival in the United States and that foreign workers usually don't come to the United States unless there is something for them to do.

64.  During the interview of West, SA Orozco and I identified a home office area used by West, located adjacent to the dining area of her residence.  The work area included a desk and computer along with an external hard drive.  According to West, the hard drive contained all of Smallboard's electronic

files.  On or about January 31, 2020, the Honorable John Z. Boyle, United States Magistrate Judge for the District of Arizona, found probable cause to issue a search warrant for West's residence, including her home office, computer, and external hard drive.

        4.    February 5, 2020 Follow-up Telephonic Interview with V.V.

65.  On February 5, 2020, I spoke to V.V. via telephone. V.V. stated that the **SUBJECT PREMISES** is located on the second floor of 30 South San Gabriel Boulevard in Pasadena, California. V.V. said that the second floor office is accessible via the stairway in the back of the building next to the bathroom. According to V.V., the first floor of the building is a furniture store called "Décor" which is owned by PAREEK's wife, Deepali Pareek.  There is a rear entrance to the furniture store adjacent to a customer parking lot.

**V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]**

66.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

35

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

67.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68. The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it likely will be necessary for law enforcement to have the ability to require other occupants of the **SUBJECT PREMISES** to press their fingers against the fingerprint sensor of the locked devices found during the search of the **SUBJECT PREMISES** in order to attempt to identify the device's user(s) and unlock the devices via fingerprint.

d.    Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrants: depress the thumb- and/or fingerprints of the person (to include PAREEK) onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person (to include PAREEK) with his or her eyes open to activate the

facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

## VI. <u>CONCLUSION</u>

69.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the **SUBJECT PREMISES** and the person described in Attachments A-1 and A-2.

_____
Manuel Gonzales, Special Agent
U.S. Department of Labor
Office of Inspector General


Subscribed to and sworn before me
this _____ day of February, 2020.


_____
UNITED STATES MAGISTRATE JUDGE